**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

MEMORIAL HERMANN HEALTH SYSTEM,

     Plaintiff,

v.

                                  **Case No. 4:17-cv-2661**

BLUE CROSS BLUE SHIELD OF TEXAS,

     Defendant.

**PLAINTIFF MEMORIAL HERMANN HEALTH SYSTEM'S
RESPONSE TO DEFENDANT'S MOTION TO DISMISS FOR
<u>IMPROPER VENUE AND MOTION TO COMPEL ARBITRATION</u>**

# TABLE OF CONTENTS

**Page**

I.  Introduction and Summary of Argument ........................................................... 1

II.  Nature and Stage of the Proceeding. ............................................................. 2

III.  Statement of Issues. .................................................................................. 2

IV.  Background. ............................................................................................. 4

    A.  In 2005, Memorial Hermann and BCBS entered into separate contracts governing reimbursement for treatment of patients covered by HMO, PPO, and Indemnity plans. ........................................ 4

    B.  The 2005 Indemnity Contract contained an arbitration clause requiring arbitration of specific categories of disputes. ........................... 6

    C.  In 2013, Memorial Hermann and BCBS entered into the BAV HMO Agreement, which does not include an arbitration clause. ........................... 7

    D.  BCBS generally complied with the BAV HMO Agreement and paid for all healthcare treatment given to BAV HMO plan members, emergency or non-emergency, for about 18 months. ............................. 9

    E.  After losing hundreds of millions of dollars on the ACA market in Texas in 2014, BCBS began breaching the BAV HMO Agreement by refusing to pay for continuing care that Memorial Hermann provided to emergency patients. ......................................................... 9

    F.  Memorial Hermann sued BCBS for breach of the BAV HMO Agreement, not for breach of the Indemnity Contract. ........................... 10

V.  The parties did not agree to arbitrate this dispute. ........................................ 11

    A.  BCBS has failed to meet its burden to establish that the parties agreed to arbitrate this dispute—the BAV HMO Agreement does not include an agreement to arbitrate. ........................................... 11

    B.  Because the BAV HMO Agreement and the Indemnity Contract are separate agreements, the narrow arbitration clause from the Indemnity Contract does not apply to this dispute. ................................... 13

VI.  This Court, and not an arbitrator, must decide whether Memorial Hermann and BCBS agreed to arbitrate this dispute; the inapplicable Indemnity Contract does not delegate arbitrability. ............................................................... 18

VII.  Conclusion. ........................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&A Global Industries, Inc. v. Wolfe,*
2001 WL 1343628 (N.D. Tex. Oct. 29, 2001) ........................................................17

*AT & T Mobility LLC, v. Concepcion,*
131 S.Ct. 1740 (2011) ...............................................................................................3

*Branch Law Firm L.L.P. v. Osborn,*
14-14-00892-CV, 2016 WL 444867 (Tex. App.—Houston [14th Dist.] Feb. 4, 2016,
pet. denied)...............................................................................................................17

*Burlington Resources Oil & Gas Co., L.P. v. San Juan Basin Royalty Trust,*
249 S.W.3d 34 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)................................20, 22

*Capital Income Properties–LXXX v. Blackmon,*
843 S.W.2d 22 (Tex. 1992)......................................................................................11

*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.,*
748 F.3d 249 (5th Cir. 2014) ...................................................................................21

*Exceed Int'l Ltd. v. DSL Corp.,*
No. H-13-2572, 2014 WL 1761264 (S.D. Tex. Apr. 30, 2014) (Atlas, J.) .............22

*First Options of Chicago, Inc. v. Kaplan,*
514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).....................................3, 21

*Haddock v. Quinn,*
287 S.W.3d 158 (Tex. App.—Fort Worth 2009, pet. denied) ...........................20, 22

*Houston Refining LP v. United Steel, Paper and Forestry,*
2016 WL 270918 (S.D. Tex. Jan. 22, 2016) (Lake, J.).............................................19

*Houston Refining LP v. United Steel, Paper and Forestry,*
765 F.3d 396 (5th Cir. 2014) ...............................................................................20, 22

*Howsam v Dean Witter Reynolds, Inc.,*
537 U.S. 79 (2002)....................................................................................................18

*I.D.E.A. Corp. v. WC & R Interests, Inc.,*
545 F. Supp. 2d 600 (W.D. Tex. 2008).................................................7, 14, 15, 16

*IKON Office Sols., Inc. v. Eifert,*
2 S.W.3d 688 (Tex. App.—Houston [14th Dist.] 1999, no pet.)............................18

*In re Bates*,
   177 S.W.3d 419 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding) ........................3, 4

*In re Bunzl USA, Inc.*,
   155 S.W.3d 202 (Tex. App.—El Paso 2004, orig. proceeding) ...............................................3

*In re Margolin*,
   05-00-00875-CV, 2000 WL 964692 (Tex. App.—Dallas July 13, 2000, no pet.) .................17

*In re Sino Swearingen Aircraft Corp.*,
   05-03-01618-CV, 2004 WL 1193960 (Tex. App.—Austin June 1, 2004, no pet.)................12

*In re Weekley Homes, L.P.*,
   180 S.W.3d 127 (Tex. 2005)...................................................................................................3

*J.M. Davidson, Inc. v. Webster*,
   128 S.W.3d 223 (Tex. 2003)...................................................................................................3

*Kubala v. Supreme Prod. Services, Inc.*,
   830 F.3d 199 (5th Cir. 2016) ................................................................................................21

*Lucchese Boot Company v. Rodriguez*, 473 S.W.3d 373 (Tex. App.—El Paso 2015, no
   pet.) ...............................................................................................................................20, 21

*Osornia v. AmeriMex Motor & Controls, Inc.*,
   367 S.W.3d 707 (Tex. App.—Houston [14th Dist.] 2012, no pet.)........................................18

*Peacock v. Wave Tec Pools, Inc.*,
   107 S.W.3d 631 (Tex. App.—Waco 2003, no pet.)................................................................4

*Pennzoil Exploration & Prod. Co. v. Ramco Energy*,
   139 F.3d 1061 (5th Cir. 1998) ..............................................................................................15

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*,
   687 F.3d 671 (5th Cir. 2012) ................................................................................................21

*Rosenblum v. Travelbyus.com Ltd.*,
   299 F.3d 657 (7th Cir. 2002) ................................................................................................14

*Seven Hills Commercial, LLC v. Mirabal Custom Homes, Inc.*,
   442 S.W.3d 706 (Tex. App.—Dallas 2014, pet. denied) .......................................................14

*Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*,
   13-17-00184-CV, 2017 WL 4054395 (Tex. App.—Corpus Christi Sept. 14, 2017, no
   pet. h.) ...................................................................................................................................20

*Trafigura Pte. v. CNA Metals Ltd.*,
   14-16-00530-CV, 2017 WL 2784950 (Tex. App.—Houston [14th Dist.] June 27,
   2017, no pet.) ........................................................................................................................20

684307.3

*Vujasinovic & Beckcom, PLLC v. Cubillos*,
  CV H-15-2546, 2016 WL 5573712 (S.D. Tex. Sept. 29, 2016) ..............................................21

*Weber v. Hall*,
  929 S.W.2d 138 (Tex. App.—Houston [14th Dist.] 1996, orig. proceeding)..........................14

*Will Drill Res., Inc. v. Samson Res. Co.*,
  352 F.3d 211 (5th Cir. 2003) ..................................................................................................3

## I.     Introduction and Summary of Argument

Blue Cross Blue Shield of Texas ("BCBS") has not met its burden to establish that the parties agreed to arbitrate this dispute. Instead, BCBS has mischaracterized Memorial Hermann Health System's claims in an improper attempt to force arbitration of a dispute that the parties did not agree to arbitrate. The Court should deny BCBS's Motion because:

- BCBS's motion is based on the false argument that Memorial Hermann is suing for breach of the Hospital Contract for Traditional Indemnity Business ("Indemnity Contract"), which governs patients covered by traditional indemnity plans and has an arbitration clause;

- But, as clearly stated in its pleading, Memorial Hermann is suing because BCBS breached (and continues to breach) a verbal and email-based contract to pay Memorial Hermann a particular rate for its treatment of patients covered by the Blue Advantage HMO ("BAV HMO") plan, a rate that BCBS paid at for about 18 months until it decided to breach that agreement (the "BAV HMO Agreement");

- The BAV HMO Agreement, entered into 8 years after the Indemnity Contract, does not include an agreement to arbitrate, as set forth in the attached affidavit;

- BCBS has not tendered any evidence that the BAV HMO plan is part of the traditional indemnity business, which is a different type of insurance product than HMO plans, or that the BAV HMO Agreement is governed by the Indemnity Contract; BCBS cannot do so because the Indemnity Contract was not amended according to its terms to add BAV HMO plan participants;

- BCBS therefore has latched onto an arbitration clause in a separate agreement that governs a different patient/insured population—the Indemnity Contract—and improperly seeks to rewrite Memorial Hermann's complaint to make the Indemnity Contract govern;

- Because Memorial Hermann is not suing under the Indemnity Contract, its arbitration clause does not apply, and this Court should deny BCBS's motion; and

- In any event, Memorial Hermann's claim for declaratory judgment—about whether BCBS complies with the Texas Insurance Code provisions concerning treatment of emergency patients—is not subject to any arbitration agreement.

BCBS, wanting to shield its conduct from the public, also wrongly asserts that the question of whether there is an applicable arbitration clause should be sent to arbitration. Because there is a dispute as to whether there is a valid agreement to arbitrate, this Court decides

whether the parties agreed to arbitrate. And, since Memorial Hermann has presented the only evidence—that there is no valid agreement to arbitrate—this Court should deny BCBS's motion and retain this case. Moreover, the narrow arbitration clause in the Indemnity Contract does not clearly and unmistakably delegate the issue of arbitrability to an arbitrator.

Because the parties do business through multiple, different agreements that each have differing scopes, terms, and conditions, it is not enough for BCBS to simply point to an arbitration provision in one separate contract, such as the Indemnity Contract, and say that any dispute between Memorial Hermann and BCBS, even if it arises under another contract, must be sent to arbitration where the arbitrator should determine whether the asserted arbitration provision applies. As a result, this Court should find that Memorial Hermann's claims under the BAV HMO Agreement are not subject to the arbitration provision in the Indemnity Contract, and deny BCBS's Motion.

## II.     Nature and Stage of the Proceeding.

This case is about BCBS refusing to pay for millions of dollars of emergency and life-saving medical treatment that its insureds have received from Memorial Hermann during the last few years, care that BCBS paid for during the first 18 months of the contract until BCBS decided to renege. Memorial Hermann sued BCBS in Texas state court on August 1, 2017. BCBS removed on the basis of diversity jurisdiction on September 3, 2017. BCBS then filed its Motion to Compel Arbitration on September 11, incorrectly alleging that the "contract underlying Memorial Hermann's complaint" is the Indemnity Contract, a contract which governs only traditional indemnity business (not HMO business like the BAV HMO plan).

## III.    Statement of Issues.

**Issue**: Should the Court deny BCBS's motion to compel arbitration because the parties did not agree to arbitrate this dispute that falls under the BAV HMO Agreement, and thus this

684307.3

case does not involve arbitrable "contract interpretations" or "claim issues" under the separate Indemnity Contract?

**Standard of Review**:  As the movant, BCBS bears the burden to establish (1) the existence of a valid agreement to arbitrate the dispute and (2) that the claims asserted by Memorial Hermann are within the scope of such agreement.  *See Will Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003).

An agreement to arbitrate is a contract, the relation of the parties is contractual, and the rights and liabilities of the parties are controlled by the law of contracts.  *See AT & T Mobility LLC, v. Concepcion*, 131 S.Ct. 1740, 1748–49, 1752–53 (2011) (arbitration is a creature of contract; a person can be compelled to arbitrate a dispute only if, to the extent that, and in the manner which, he has agreed to do so).  Since arbitration is generally a matter of contract, courts should honor the parties' expectations.  *Id.* at 1752–53; *see also In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, orig. proceeding) ("[A] party cannot be compelled to arbitrate a dispute unless he has agreed to do so.").

When deciding whether parties agreed to arbitrate, courts should apply ordinary state law principles regarding the formation of contracts.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995); *J.M. Davidson*, 128 S.W.3d at 227–28; *see also In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005) ("Generally under the FAA, state law governs whether a litigant agreed to arbitrate.").  In conducting its review, the Court "may not expand upon the terms of the contract or tolerate a liberal interpretation of it by reading into it a voluntary, consensual agreement to arbitrate when one otherwise does not exist." *In re Bates*, 177 S.W.3d 419, 422 (Tex. App.-Houston [1st Dist.]

2005, orig. proceeding). "Although an arbitration agreement does not have to assume any particular form, the language of the agreement must clearly indicate the intent to arbitrate." *Id.* Additionally, in resolving disputes regarding interpretation of an arbitration agreement, courts are to apply standard principles of contract interpretation and construction. *Peacock v. Wave Tec Pools, Inc.*, 107 S.W.3d 631, 636 (Tex. App.—Waco 2003, no pet.). The plain meaning of the contractual language should be looked to in order to ascertain the intent of the parties. *Id.*

## IV. Background.

### A. In 2005, Memorial Hermann and BCBS entered into separate contracts governing reimbursement for treatment of patients covered by HMO, PPO, and Indemnity plans.

Memorial Hermann is a non-profit, charitable healthcare system, the largest such system in Texas. BCBS offers, issues, and administers insurance plans that provide access to health care services. Persons covered under insurance policies issued or administered by BCBS and its affiliates ("insureds") receive health care services at Memorial Hermann. The insurance benefits are governed by a number of different types of agreements between the individual patients and BCBS or an employer health plan administered by BCBS. These plans include Health Maintenance Organization ("HMO"), Preferred Provider Organization ("PPO"), and Traditional Indemnity ("Indemnity"). Each type of plan provides different benefits and coverage.

Separate from these insurance policies between BCBS and its insureds, business between Memorial Hermann and BCBS is governed by multiple, different agreements. Ex. 1, Affidavit of Michelle Lindsley, at ¶ 3. Each agreement has a specific purpose and applies to a specific subset of patients who are insured by BCBS and receive medical treatment at Memorial Hermann. *Id.* These agreements provide BCBS with a contractual discount from Memorial Hermann's usual and customary charges when BCBS's insureds receive medical or health services at Memorial Hermann's facilities. *Id.* The rates of reimbursement/payment and other material terms and

conditions vary from agreement to agreement. *Id.* When Memorial Hermann and BCBS enter into such an agreement, Memorial Hermann is considered "in-network" for that particular group of BCBS insureds. *Id.*

Effective May 1, 2005 Memorial Hermann and BCBS entered into the Hospital Agreement for HMO Network Participation ("HMO Agreement") and the Hospital Agreement for PPO/POS Network Participation ("PPO Agreement"). Ex. 1, Lindsley Aff., at ¶ 4. Each is a separately-negotiated contract that contains unique financial and other terms, i.e. specific rates apply to payment for treatment given to a particular type of insured. *Id.*, at ¶ 5. When an HMO insured receives treatment, Memorial Hermann expects payment pursuant to the HMO Agreement. *Id.* When a PPO insured with BCBS is treated, Memorial Hermann expects payment under the terms of the PPO Agreement. *Id.*

Also effective May 1, 2005, Memorial Hermann and BCBS entered into the Hospital Contract for Traditional Indemnity Business ("Indemnity Contract"). Ex. 1, Lindsley Aff., at ¶ 6. Traditional indemnity business is an insurance product that is different from HMO or PPO. *Id.*, at ¶ 7. It is a very small patient population compared to the HMO and PPO patient populations. *Id.* When the Indemnity Contract was negotiated and executed, Memorial Hermann and BCBS contemplated and agreed that the Indemnity Contract would apply only to the traditional indemnity business. *Id.*, at ¶ 8. They did not agree that other types of insurance products, such as HMO, fell under the Indemnity Contract. *Id.* As reflected in the title and in other provisions of the agreement, the Indemnity Contract governs reimbursement of BCBS insureds covered by a traditional indemnity plan. *Id.*; *see also* Ex. 1-A, at 1 (titled "Hospital Contract for Traditional Indemnity Business"); *id.* at Art. 15 (referring to "HOSPITAL's status as a contracting hospital with BCBSTX for traditional indemnity business"). When a BCBS insured covered by a

traditional indemnity plan is treated at one of its facilities, Memorial Hermann expects to be paid pursuant to the terms of the Indemnity Contract, including but not limited to the rate term (known as the PAR rate). Ex. 1, Lindsley Aff., at ¶ 7.

From May 1, 2005 through the present, the HMO and PPO Agreements and the Indemnity Contract have been in place and Memorial Hermann has been a contracted "in-network" provider for BCBS insureds covered by the applicable HMO, PPO, and Indemnity insurance policies.

**B.**     **The 2005 Indemnity Contract contained an arbitration clause requiring arbitration of specific categories of disputes.**

When BCBS and Memorial Hermann agreed to a contract to govern the traditional indemnity business in 2005, they also agreed to arbitrate certain disputes under the Indemnity Contract. The arbitration clause provided in relevant part as follows:

> After exhausting the remedies contained in this Article 11, *any Contract interpretation or claim issue* which the HOSPITAL or BCBSTX determines has not been satisfactorily resolved shall be resolved by arbitration under the commercial rules and regulations of the American Arbitration Association, and in accordance with the Texas General Arbitration Act (Chapter 171 Texas Civil Practice and Remedies Code).

Ex. 1-A, at Art. 11(C) (emphasis added). Unlike broad arbitration clauses, the Indemnity Contract's narrow arbitration clause does not require arbitration of all disputes relating to, concerning, or connected to the Indemnity Contract. It applies only to disputes over (1) interpretation of the Indemnity Contract and (2) claim issues for patients covered by traditional indemnity insurance plans. Moreover, the Indemnity Contract also contains an "entire agreement" clause, which states:

> This Contract and any exhibit(s) shall constitute the entire Contract.
>
> The Contract and exhibit(s) may be amended only by written agreement between the HOSPITAL and BCBSTX. Only the BCBSTX Vice President of Network

Management, or his designee, has the authority to amend any provision of the
Contract and exhibit(s) for BCBSTX.

*Id.*, at Art. 21. This clause demonstrates that the parties agreed the arbitration provision would

apply only to claims arising under this agreement, *i.e.* the Indemnity Contract.

> **C.     In 2013, Memorial Hermann and BCBS entered into the BAV HMO
> Agreement, which does not include an arbitration clause.**

In the fall of 2013, over eight years after the Indemnity Contract was signed, BCBS

began offering health insurance plans over the exchanges created under the Affordable Care Act

("ACA"), with an effective start date of January 1, 2014. Ex. 1, Lindsley Aff., at ¶ 9. One of

those new ACA plans offered by BCBS was the Blue Advantage HMO ("BAV HMO") plan. *Id.*

When the BAV HMO plan was introduced, it was not included in BCBS's HMO Agreement

with Memorial Hermann. *Id.* Thus, BCBS initially designated Memorial Hermann as "out-of-

network" for BAV HMO plan members. *Id.* Under the "out-of-network" scenario, the payor

must reimburse the healthcare provider at its usual and customary rate, i.e. 100% of its billed

charges (no contractual discount). *Id.*

However, before the BAV HMO plan took effect, BCBS took the position that the

Indemnity Contract governed reimbursement for healthcare services that Memorial Hermann

provided to BAV HMO insureds. Ex. 1, Lindsley Aff. at ¶ 10. In other words, BCBS argued

that it could pay less than 100% of Memorial Hermann's usual and customary charges because,

according to BCBS, the Indemnity Contract governed reimbursement for the BAV HMO plan

(which is not a traditional indemnity product). Memorial Hermann disagreed and maintained

that the Indemnity Contract did not govern reimbursement of treatment provided to BAV HMO

insureds. *Id.* Memorial Hermann emphasized that the Indemnity Contract applied only to

"traditional indemnity" business, which is a different product and different patient population

from HMO plans. *Id.*

Throughout the fall of 2013, Memorial Hermann and BCBS had multiple e-mails, phone calls, and meetings about this disagreement, as well as about other points they were negotiating concerning the PPO Agreement, HMO Agreement, and Indemnity Contract. Ex. 1, Lindsley Aff., at ¶¶ 11-14. One proposal that Memorial Hermann made was that if BCBS would agree to Memorial Hermann's proposed amended acquisition language for the HMO and PPO Agreements (concerning how these contracts would address facilities that are acquired by Memorial Hermann) then Memorial Hermann would agree to amend the Indemnity Contract to provide that it also applied to services provided to BAV HMO plan members. *Id.* at ¶ 11. BCBS did not accept this proposal. *Id.* The Indemnity Contract was not amended to add the BAV HMO plan. *Id.* Memorial Hermann made a modified version of this proposal, which was also rejected. *Id.* at ¶ 12. No amendment to the Indemnity Contract to add the BAV HMO plan was signed. *Id.*

Memorial Hermann then proposed to BCBSTX that if the PAR rate were increased then Memorial Hermann would agree to amend the Indemnity Contract to state that it also governed the BAV HMO plan. Ex. 1, Lindsley Aff., at ¶ 13. BCBS did not accept this proposal either. *Id.* The Indemnity Contract was not amended to increase the PAR rate or to state that the Indemnity Contract also applies to BAV HMO plan members. *Id.*

Through subsequent negotiation in late 2013, the parties ultimately agreed that BCBS would pay Memorial Hermann at the PAR *rate* for healthcare services and treatment provided to BAV HMO plan members ("the BAV HMO Agreement"). Ex. 1, Lindsley Aff., at ¶ 14. The parties also agreed to amend the Indemnity Contract to eliminate the scheduled 5% reduction in the PAR rate effective January 1, 2015. *Id.* The Indemnity Contract was *not* amended to state that it also applied to patients covered by the BAV HMO plan. *Id.* Instead, Memorial Hermann

and BCBC agreed to use the *rate* from the Indemnity Contract for the BAV HMO patient population. *Id.* The material terms of the BAV HMO Agreement are that BCBS will reimburse Memorial Hermann at the PAR rate for the care rendered to BAV HMO plan members who are treated at Memorial Hermann facilities. *Id.*

### D. BCBS generally complied with the BAV HMO Agreement and paid for all healthcare treatment given to BAV HMO plan members, emergency or non-emergency, for about 18 months.

BCBS generally complied with the BAV HMO Agreement for the first 18 months and generally paid Memorial Hermann at the PAR rate for *all* of the healthcare services that BAV HMO insureds received at Memorial Hermann facilities. Ex. 1, Lindsley Aff., at ¶ 18. There were thousands of such claims during this time period (January 2014 through mid-2015) for which BCBS paid millions of dollars at the PAR rate pursuant to the BAV HMO Agreement. *Id.* BCBS did not claim that the BAV HMO plan members were required to be transferred to another facility upon "stabilization" because Memorial Hermann was "out-of-network."

### E. After losing hundreds of millions of dollars on the ACA market in Texas in 2014, BCBS began breaching the BAV HMO Agreement by refusing to pay for continuing care that Memorial Hermann provided to emergency patients.

In mid-2015, BCBS notified its customers and agents that it had lost more than $400 million on its ACA Exchange products in Texas for the year 2014. Ex. 1, Lindsley Aff., at ¶ 19. In other words, when setting its premium rates for the forthcoming new ACA Exchange products in Texas, BCBS underestimated potential claims for healthcare for the upcoming 2014 year and ended up paying out $400 million more than it collected in premiums in Texas that year. Beginning in 2015, BCBS began looking for any and all ways to recoup its losses. Therefore, it was no coincidence that in mid-2015 BCBS began denying hundreds of claim payments for treatment that Memorial Hermann provided to BAV HMO plan members who came to Memorial Hermann with emergency conditions. *Id.* Contrary to the parties' agreement

and to their prior conduct for the previous 18 months, for hundreds of claims BCBS began paying only for what BCBS deemed, after the fact, to be "emergency treatment" and denying claims for what BCBS deemed to be "post-stabilization treatment."[1]  *Id.*

BCBS's belated position is that Memorial Hermann must force BAV HMO plan members out of a Memorial Hermann facility, requiring them to leave the facility and transfer to an "in-network" hospital so that BCBS can save a little money, even if it disrupts the patient's continuity of care, endangers patient safety, and subjects Memorial Hermann to potential liability for improper transfers or medical malpractice.  As a result of BCBS's change in position in mid-2015, BCBS substantially increased its denials of payment for anything beyond what BCBS unilaterally deemed to be "emergency" care, going from approximately one such denial per month, on average, to approximately 40 such denials per month, on average.  If, as BCBS now insists, the BAV HMO members had been transferred to an "in-network" facility for continuing care, BCBS still would have had to pay the "in-network" provider for those services.  However, under BCBS's view of the world, BCBS does not have to pay *anything at all* and can shift the cost of continuing, related medical care to its own BAV HMO plan members (by denying benefits) or to Memorial Hermann (by denying claims).  *See* Ex. 1, Lindsley Aff., at ¶ 20.

**F.     Memorial Hermann sued BCBS for breach of the BAV HMO Agreement, not for breach of the Indemnity Contract.**

BCBS repeatedly mischaracterizes Memorial Hermann's claims to make the argument that the Indemnity Contract is the governing agreement.  For example, citing to paragraph 20 of the Original Petition, BCBS says it "took the position that the Traditional Contract applied for

---

[1] By contrast, BCBS has not denied payment of claims for "post-stabilization" services provided to patients covered by a traditional indemnity insurance plan.   Ex. 1, Lindsley Aff., at ¶ 21.  BCBS has not told Memorial Hermann that it must transfer to another hospital a patient covered by a traditional indemnity insurance plan because Memorial Hermann is not "in-network" for that traditional indemnity plan.  *Id.*

reimbursement of services provided by Memorial Hermann to BAV Plan members" and that "Memorial Hermann eventually agreed." Dkt. No. 8, at 5. Actually reading paragraph 20 of the Original Petition reveals that Memorial Hermann agreed that BCBS could use the *rate* from the Indemnity Contract for such reimbursement—it does not say that Memorial Hermann agreed to application of the *entire* Indemnity Contract.

In its pleading, Memorial Hermann alleges the following for the breach of contract claim:

> BCBS and Memorial Hermann entered into an agreement, based on their oral and written communications, that BCBS would reimburse Memorial Hermann for all services provided to BAV insureds at Memorial Hermann using the PAR reimbursement rate. BCBS breached its agreement with Memorial Hermann by failing to pay claims for healthcare services provided to BAV plan members.

Dkt. No. 3-1, at ¶ 35. Memorial Hermann did not allege that the Indemnity Contract is the basis for its breach of contract claim. Memorial Hermann did not allege that BCBS breached the Indemnity Contract by failing to pay for services provided to BAV HMO plan members. Memorial Hermann is not seeking in this lawsuit to be paid for healthcare services or treatment that it provided to patients covered by traditional indemnity insurance plans.

BCBS's Motion is based on an improper attempt to rewrite and mischaracterize Memorial Hermann's pleaded claims.

## V. The parties did not agree to arbitrate this dispute.

### A. BCBS has failed to meet its burden to establish that the parties agreed to arbitrate this dispute—the BAV HMO Agreement does not include an agreement to arbitrate.

In determining whether Memorial Hermann and BCBS entered into an agreement to arbitrate, the nature of the parties' relationship is critical. If their sole relationship were established and governed by a single contract with a valid arbitration provision (e.g., the Indemnity Contract), their disputes would be more likely to be subject to arbitration. *See, e.g., Capital Income Properties–LXXX v. Blackmon*, 843 S.W.2d 22, 23 (Tex. 1992) (single limited

partnership agreement with broad arbitration provision).  But when, as here, the relationship extends beyond just a single agreement and is governed by separate and independent agreements, the question of whether the parties agreed to arbitrate must be answered by examining each agreement individually to answer the contract formation question one agreement at a time.  *See, e.g.*, *In re Sino Swearingen Aircraft Corp.*, 05-03-01618-CV, 2004 WL 1193960, at *3 (Tex. App.—Austin June 1, 2004, no pet.) (concluding that the narrow arbitration clause in one agreement "does not encompass the parties' dispute under" other agreements).

The BAV HMO Agreement, in which the parties agreed upon the rate of payment for BAV HMO patients, is separate from the Indemnity Contract. Ex. 1, Lindsley Aff., at ¶¶ 6-7, 14. The Indemnity Contract governs the entire relationship between Memorial Hermann and BCBS as it relates to *traditional indemnity* business, which is not the same as HMO.  *Id.*, at ¶¶ 6-8. Memorial Hermann and BCBS agreed that the *rate* set forth in the Indemnity Contract would apply to reimbursement of claims for services provided to BAV HMO plan members.  *Id.*, at ¶ 14.  That is the substance of the BAV HMO Agreement.  The parties did not agree that the *entire* Indemnity Contract applied to healthcare treatment given to BAV HMO plan members, who are covered by an HMO product and not by a traditional indemnity plan.  *Id.* at ¶¶ 14, 16.

When Memorial Hermann and BCBS entered into the BAV HMO Agreement, they did not agree upon, much less discuss, an arbitration provision.  Ex. 1, Lindsley Aff., at ¶ 17.  The BAV HMO Agreement's material terms are that BCBS would pay, and Memorial Hermann would accept, the PAR rate for all treatment provided to patients covered by the BAV HMO plan.  *Id.*, at ¶¶ 14, 17.  Memorial Hermann expected that any dispute concerning BAV HMO claims would be resolved in court.  *Id.*, at ¶ 17.  The parties did not reach an agreement to arbitrate BAV HMO claims.

Thus, BCBS has not met its burden to show a valid agreement to arbitrate.

**B. Because the BAV HMO Agreement and the Indemnity Contract are separate agreements, the narrow arbitration clause from the Indemnity Contract does not apply to this dispute.**

The Indemnity Contract governs the relationship between Memorial Hermann and BCBS with respect to all traditional indemnity plans offered by BCBS. It does not govern the relationship between Memorial Hermann and BCBS with respect to the BAV HMO plan.

BCBS argues that the Indemnity Contract applies to BAV HMO plan members because of the definition of "Subscribers" in the Indemnity Contract. Wrong. The Indemnity Contract applies to traditional indemnity business, only. Ex. 1, Lindsley Aff., at ¶¶ 6-8. It is not a "broad-ranging" umbrella contract that covers payment for treatment given to *all* BCBS insureds. *Id.* If it were as broad as BCBS claims, the Indemnity Contract would obviate the need for all other managed care agreements between Memorial Hermann and BCBS. Obviously, it does not. The Indemnity Contract applies to traditional indemnity business, which is a very small patient population that is entirely different from the BAV HMO patient population. *See* Ex. 1, Lindsley Aff., at ¶ 7; *see also* Ex. 1-A, at 1 (title); *id.*, at Art. 15 (referring to "HOSPITAL's status as a contracting hospital with BCBSTX for traditional indemnity business").[2] The Indemnity Contract and the BAV HMO Agreement are separate.

When parties have multiple contracts that govern their relationship, courts refuse to compel arbitration when the movant relies upon an arbitration clause that is found in a separate

---

[2] BCBS offers the BAV HMO plan to individuals through the ACA. Ex. 1, Lindsley Aff., at ¶ 9. The BAV HMO plan is not a traditional indemnity plan. *Id.*, at ¶¶ 9-10. It is an HMO plan that has its own benefits, terms, and policies. *See* BAV HMO Quick Reference Guide, available at https://www.bcbstx.com/provider/pdf/tx_provider_blue_advantage_hmo _quick_reference_guide.pdf (last accessed September 29, 2017). By contrast, BCBS's Indemnity plans are not HMO plans. Ex. 1, Lindsley Aff. at ¶ 7. Each Indemnity plan has its own benefits terms, and policies. *See* Traditional/Indemnity Quick Reference Guide, available at https://www.bcbstx.com/provider/pdf/parplan_qrg.pdf (last accessed September 29, 2017).

agreement that is not the subject of the breach of contract claim. In such circumstances, the parties have not agreed to arbitrate. For example, in *Weber v. Hall*, 929 S.W.2d 138, 142 (Tex. App.—Houston [14th Dist.] 1996, orig. proceeding), the court held that an arbitration clause in the plaintiffs' employment agreement did not apply to the plaintiffs' claim for breach of a separate sales commission agreement. *Id.* The clause at issue required arbitration of all disputes "as to all or any part of" an employment agreement. *Id.* The plaintiffs, however, were not suing for breach of the employment agreement. *Id.* The appellate court noted that the two agreements were not executed contemporaneously, did not have the same purpose, and thus did not have to be read together. *Id.* at 143. As a result, the court held that the parties had not agreed to arbitrate the sales commission dispute because that dispute did not concern the provisions of the separate employment agreement, noting that "[t]he federal policy of resolving doubts in favor of arbitration may not serve to stretch a contract beyond the scope intended by the parties." *Id.*; *see also Seven Hills Commercial, LLC v. Mirabal Custom Homes, Inc.*, 442 S.W.3d 706, 717-19 (Tex. App.—Dallas 2014, pet. denied) (holding that arbitration clause in LLC agreement did not apply to LLC member's claims for breach of separate agreement and/or quantum meruit concerning a promised "promote interest" in real estate projects); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 664 (7th Cir. 2002) (arbitration clause in employment agreement did govern the dispute because the plaintiff's claims arose under the separate acquisition agreement governing the purchase and sale of the business).

Similarly, in *I.D.E.A. Corp. v. WC & R Interests, Inc.*, 545 F. Supp. 2d 600, 606 (W.D. Tex. 2008), the court denied a motion to compel arbitration where the plaintiff had sued for breach of the parties' Manufacturing Agreement and the defendant sought arbitration pursuant to an arbitration provision in the parties' separate Business Relationship Agreement ("BRA").

Central to the court's decision was that the arbitration provision was narrow in scope—it was limited to disputes "arising under this Agreement"—and that the BRA contained an entire agreement clause.[3] *Id.* at 605, 607. The court said: "An entire agreement clause demonstrates that the parties did not intend for an arbitration provision contained in the same agreement to apply to claims arising under a separate agreement." *Id.*, at 607.

The same rule applies here. BCBS cites only to the Indemnity Contract and relies only on the arbitration provision in the Indemnity Contract. Importantly, like the separate contract in *I.D.E.A. Corp.*, the Indemnity Contract contains a narrow arbitration provision, limited to "contract interpretation" and "claim issues," as well as an "entire agreement" clause that limits application of the arbitration provision to the Indemnity Contract alone. Ex. 1-A, at Art. 11(C), Art. 21.

Because the Indemnity Contract does not cover "any and all disputes" that are "related to," "connected to," or "concerning" the Indemnity Contract, Memorial Hermann's claims for breach of the BAV HMO Agreement, alternatively for quantum meruit, and for declaratory judgment do not fall within the narrow scope of the arbitration provision. Memorial Hermann's claims do not involve interpretation of the Indemnity Contract, nor claim issues for patients covered by traditional indemnity plans. *See* Dkt. 3-1, at ¶¶ 34-50. First, the claim for breach of the BAV HMO Agreement depends upon whether BCBS agreed to pay Memorial Hermann at a specific rate for all treatment provided to BAV HMO patients (or just for emergency care), and whether BCBS has paid Memorial Hermann at that rate. There is nothing in the separate

---

[3] "[C]ourts distinguish 'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract." *Pennzoil Exploration & Prod. Co. v. Ramco Energy*, 139 F.3d 1061, 1067 (5th Cir. 1998). An arbitration provision that expressly encompasses disputes "related to" or "connected with" the agreement containing the provision is construed broadly. *Id.*

Indemnity Contract that needs to be "interpreted" in order to resolve that claim. Second, the alternative claim for quantum meruit presupposes the lack of a contract, so there would not be any "interpretation" of the Indemnity Contract there either. Third, to the extent that Memorial Hermann's declaratory judgment claim involves a contract, it involves only the BAV HMO Agreement. Memorial Hermann does not seek a declaration concerning a difference in opinion as to whether the PAR rate is X or Y—it seeks a declaration that BCBS's conduct violates Texas statutory law and the parties' BAV HMO Agreement. Whether BCBS complies with the Texas Insurance Code provisions concerning payment for treatment of emergency patients is not a question that the parties agreed to arbitrate. Finally, none of the "claim issues" in this case involve patients covered by traditional indemnity insurance plans. The only disputed claim issues are for patients covered by the BAV HMO plan.

Moreover, as in *I.D.E.A. Corp.*, the Indemnity Contract contains an "entire agreement" clause that states:

> This Contract and any exhibit(s) shall constitute the entire Contract.
>
> The Contract and exhibit(s) may be amended only by written agreement between the HOSPITAL and BCBSTX. Only the BCBSTX Vice President of Network Management, or his designee, has the authority to amend any provision of the Contract and exhibit(s) for BCBSTX.

Ex. 1-A, at Art. 21. This clause shows that Memorial Hermann and BCBS did not intend for the arbitration provision in the Indemnity Contract to apply to disputes arising under a separate contract. *I.D.E.A. Corp.*, 545 F. Supp. 2d at 606. That the parties may have agreed to arbitrate disputes concerning "contract interpretation" and "claim issues" under the Indemnity Contract has no bearing on whether the parties separately agreed to arbitrate their disputes arising under the separate BAV HMO Agreement. *See* Ex. 1, Lindsley Aff., at ¶¶ 16-17.

BCBS also argues that the arbitration provision from the Indemnity Contract applies to Memorial Hermann's claims because the factual allegations in the petition "implicate" the Indemnity Contract. Dkt. No. 8, at 13-14. This argument is misplaced and, again, relies on a mischaracterization of Memorial Hermann's claims and allegations. The BAV HMO Agreement borrows the *rate term* from the Indemnity Contract—it does not include any other terms from the Indemnity Contract. Therefore, as in a case cited by BCBS itself, "reference to the [Indemnity Contract] is required only as an evidentiary matter"—for instance, to show the specific rate of reimbursement—"not as a legal matter in order for [Memorial Hermann] to maintain [its] claim." *See A&A Global Industries, Inc. v. Wolfe*, 2001 WL 1343628, at *4 (N.D. Tex. Oct. 29, 2001). The factual and legal basis of Memorial Hermann's claims is not the Indemnity Contract. Therefore, Memorial Hermann's claims are not "so interwoven" with the Indemnity Contract that they "cannot stand alone." *See id.*

Furthermore, because the Indemnity Contract's arbitration provision is narrow, the cases compelling to arbitration claims that were "factually intertwined" or "inextricably enmeshed" with the contract containing the arbitration provision do not apply here. *Compare Branch Law Firm L.L.P. v. Osborn*, 14-14-00892-CV, 2016 WL 444867, at *11 (Tex. App.—Houston [14th Dist.] Feb. 4, 2016, pet. denied) ("When the contract contains a broadly written arbitration clause, as long as the allegations touch matters, have a significant relationship with, or are inextricably enmeshed or factually intertwined with the contract, the claim will be arbitrable."); *with In re Margolin*, 05-00-00875-CV, 2000 WL 964692, at *2 (Tex. App.—Dallas July 13, 2000, no pet.) ("Because of the narrow and limited scope of the arbitration clause included in the Voting Agreement, we reject Margolin's argument that the alleged breaches of the Shareholders

Agreement and Management Agreement fall within the scope of the arbitration agreement because they are so factually intertwined with the Voting Agreement.").[4]

Memorial Hermann and BCBS only agreed to arbitrate disputes concerning interpretation of the Indemnity Contract and disputes over claims for patients covered by traditional indemnity plans. Memorial Hermann's claims involve neither. Thus, the Indemnity Contract's arbitration clause is not susceptible of an interpretation that would cover Memorial Hermann's claims for breach of the BAV HMO Agreement, quantum meruit, and declaratory judgment concerning BCBS's obligations under the Texas Insurance Code. *See, e.g.*, *Osornia*, 367 S.W.3d at 713; *IKON Office Sols., Inc. v. Eifert*, 2 S.W.3d 688, 696 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("[T]he narrow arbitration clause in this case covers only disputes related to the termination of employment. Eifert's claims are not based on the termination of his employment. Therefore, they are not covered by the arbitration provision.").

## VI. This Court, and not an arbitrator, must decide whether Memorial Hermann and BCBS agreed to arbitrate this dispute; the inapplicable Indemnity Contract does not delegate arbitrability.

BCBS acknowledges that the question of whether the parties have submitted a particular dispute to arbitration is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *See Howsam v Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649

---

[4] *See also Osornia v. AmeriMex Motor & Controls, Inc.*, 367 S.W.3d 707, 713 (Tex. App.— Houston [14th Dist.] 2012, no pet.) ("Significantly, the cases in which this formulation ["factually intertwined"] has been utilized have involved very broad arbitration clauses in which the parties agree to arbitrate all claims arising out of or relating to a contract or in which the parties agree to arbitrate all disputes that may arise among them."). In *Osornia*, the court affirmed the denial of a motion to compel arbitration where the arbitration provision was narrow—"any and all claims arising out of this Agreement"—and the plaintiff did not allege a breach of the agreement or a disputed interpretation of the agreement. *Id.*, at 713-15.

(1986)).  But, BCBS then asserts that this Court should not make the decision on arbitration because of an alleged "delegation" of the issue to the AAA.

As noted above in section V., the Indemnity contract does not apply to BAV HMO claims, and this Court has recognized that whether there is an agreement to arbitrate is a decision for this Court, not the arbitrator.  *Houston Refining LP v. United Steel, Paper and Forestry*, 2016 WL 270918, * 7 (S.D. Tex. Jan. 22, 2016) (Lake, J.) (CL # 3:  "Whether an agreement to arbitrate exists, on which a matter of breach can arise, is a question of law for the Court."). However, even if the Indemnity Contract may apply, there was no delegation.

Here, the Indemnity Contract states in Article 11.C:

> After exhausting the remedies contained in this Article 11, any Contract interpretation or claim issue which the HOSPITAL or BCBSTX determines has not been satisfactorily resolved shall be resolved by arbitration under the commercial rules and regulations of the American Arbitration Association, and in accordance with the Texas General Arbitration Act (Chapter 171 Texas Civil Practice and Remedies Code).

There are three key aspects to this clause:  (1) it makes no mention of any intent by any party to delegate arbitrability issues to an arbitrator; (2) it is a narrow or limited arbitration clause; it does not address all disputes arising from, relating to, referring to or connected in any manner to the Indemnity Contract; and (3) it applies Texas law (*see also* Article 20, Texas choice of law).

BCBS argues that Texas and Fifth Circuit case law simply hold that incorporation of AAA rules into an arbitration clause necessarily means that a Court must find that the parties intended that the arbitrator decide arbitrability issues.  Dkt. No 8, at 9-11.  The test is not that simple.  The United States Supreme Court has noted that "the law treats silence or ambiguity about the question '*who* (primarily) should decide arbitrability' different from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement' so as to not 'force unwilling

parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.'" *Burlington Resources Oil & Gas Co., L.P. v. San Juan Basin Royalty Trust*, 249 S.W.3d 34, 39-40 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

Texas and Fifth Circuit case law instead hold that a court only should find delegation when there is (1) a specific mention of gateway issues like arbitrability or (2) a broad arbitration clause that clearly and unmistakably provides for arbitration of *all* disputes, *plus* an express incorporation of arbitration rules. *See, e.g., Trafigura Pte. v. CNA Metals Ltd.*, 14-16-00530-CV, 2017 WL 2784950, at ** 4-5 (Tex. App.—Houston [14th Dist.] June 27, 2017, no pet.) ("[W]hen a broad arbitration agreement exists between the parties, and when that agreement incorporates arbitration rules that specifically empower the arbitrator to decide issues of arbitrability, then the incorporation of those rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability to the arbitrator.") (finding broad clause, unlike this case); *Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, 13-17-00184-CV, 2017 WL 4054395, *4 (Tex. App.—Corpus Christi Sept. 14, 2017, no pet. h.) ("When the parties agree to a broad arbitration clause, and that clause incorporates arbitration rules that specifically empower an arbitrator to decide issues of arbitrability, the incorporation of those rules may serve as clear and unmistakable evidence of the parties' agreement to delegate such issues to an arbitrator.") (finding broad clause, unlike this case); *Lucchese Boot Company v.* Rodriguez, 473 S.W.3d 373, 381-382 (Tex. App.—El Paso 2015, no pet.); *Burlington Resources*, 249 S.W.3d at 39-40; *Haddock v. Quinn*, 287 S.W.3d 158, 173, 175 (Tex. App.—Fort Worth 2009, pet. denied); *see also Houston Refining LP v. United Steel, Paper and Forestry*, 765 F.3d 396, 408-412 (5th Cir. 2014). This is because courts "hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving

the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

The *Lucchese Boot* court distinguished the cases cited by the party in that case (like the BCBS-cited cases here)[5] on the basis that "[i]n those cases, the arbitration agreements either applied specifically to gateway issues or otherwise purported to apply to *all* disputes between an employer and employee, meaning that procedural rules giving an arbitrator the power to rule on whether a claim is even subject to arbitration were consistent with the parties' intent to completely exclude the courts from the dispute-resolution process." 473 S.W.3d at 382. The *Lucchese Boot* court held*:*

> Given that the agreement's plain language purports to restrict the arbitrator's power to hear only certain classes of disputes, we will not read an unwritten clause into the agreement that enlarges the arbitrator's power to rule on unenumerated gateway issue disputes based on silence or mere incorporation by reference of general arbitration rules.

*Id*. at 383 (citing cases and doctrine that expression of one or more things implies the exclusion of all not expressed).

---

[5] By examples: In *Kubala v. Supreme Prod. Services, Inc.*, 830 F.3d 199, 200 (5th Cir. 2016)*,* the arbitration agreement "contained a 'delegation clause' that assigned to the arbitrator the power to make gateway determinations as to the arbitrability of a specific claim." In *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 674 (5th Cir. 2012)*,* the arbitration clause read: "[t]hey shall submit to binding arbitration the [REA] and *all* claims and disputes between them arising out of or relating to the Subcontract." (emphasis added). In *Vujasinovic & Beckcom, PLLC v. Cubillos*, CV H-15-2546, 2016 WL 5573712, at *2 (S.D. Tex. Sept. 29, 2016), the arbitration clause read: "*ANY AND ALL* DISPUTES, CONTROVERSIES, CLAIMS OR DEMANDS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY PROVISION HEREOF…." (emphasis added)*.* In *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 256 (5th Cir. 2014)*,* applying Arizona law, the arbitration clause read: "[a]ny and *all* disputes in connection with or arising out of the Provider agreement…." (emphasis added).

Here, the Indemnity Contract contains no specific reference to gateway / arbitrability issues, nor is there any broad agreement to arbitrate *all* disputes *related to or connected with* the agreement. *See* Ex. 1-A, at Art. 11-C. In *Burlington Resources,* the Texas court refused to find arbitrability was delegated where the parties' arbitration agreement was of limited scope, addressing only certain issues. 287 S.W.3d at 40. The *Burlington Resources* court then alternatively held that "[e]ven if we were to conclude, based, in part, on the authority cited below, that some ambiguity was created by the parties' reference to the AAA rules, the parties simply did not clearly and unmistakably submit the issue of arbitrability to arbitration." *Id.* Both *Burlington Resources* holdings apply in this case – the lack of an arbitration clause that clearly and unmistakably states that it applies to all disputes between Memorial Hermann and BCBS precludes delegation, and to the extent that there is any ambiguity as to the scope of the arbitration clause, that also precludes delegation. *See also Haddock*, 287 S.W.3d at 175 ("Silence is not 'clear and unmistakable evidence' of intent. The agreement is silent as to whether the parties intended to incorporate the current rules, silent as to whether the arbitrator is to decide issues or 'arbitrability,'…"); *Houston Refining LP v. United Steel, Paper and Forestry*, 765 F.3d 396, 408-412 (5th Cir. 2014) ("Because we hold that the parties here did *not* clearly and unmistakably agree to arbitrate arbitrability, *see supra* Part IV.A., courts must decide arbitrability questions independently."); *Arbitration between Exceed Int'l Ltd. v. DSL Corp.*, No. H-13-2572, 2014 WL 1761264, at *3 (S.D. Tex. Apr. 30, 2014) (Atlas, J.) (concluding that incorporation of arbitral body's rules did not express clear and unmistakable intent to delegate issue of arbitrability to arbitrator, and ruling on the question of whether the parties agreed to arbitrate the dispute).

Memorial Hermann and BCBS did not agree to arbitrate. Even if they did, Memorial Hermann and BCBS did not clearly and unmistakably delegate the issue of arbitrability away from the courts and to an arbitrator. This Court should examine the pleadings and evidence in order to determine that Memorial Hermann's claims concerning breach of the BAV HMO Agreement, quantum meruit, and declaratory judgment are not subject to the arbitration clause in the Indemnity Contract.

## VII. Conclusion.

Memorial Hermann and BCBS did not agree to arbitrate claims resulting from BCBS's failure to pay for medical treatment provided by Memorial Hermann to patients covered by the BAV HMO plan. The Court should deny BCBS' Motion.

684307.3

DATED: October 2, 2017.

Respectfully submitted,

SMYSER KAPLAN & VESELKA, L.L.P.

*/s/ Jeff Potts*
    Jeff Potts
    State Bar No. 00784781
    jpotts@skv.com
    Jarod R. Stewart
    State Bar No. 24066147
    jstewart@skv.com
700 Louisiana, Suite 2300
Houston, Texas 77002
713/221-2300 - telephone
713/221-2320 - fax

**ATTORNEYS FOR MEMORIAL HERMANN
HEALTH SYSTEM**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on October 2, 2017, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide electronic notice to all counsel of record.

*/s/ Jarod R. Stewart*
Jarod R. Stewart